In re Daniel D. WILLEY, Debtor.

Cindy WILLEY, individually and as the next friend of Kristina Willey, Plaintiffs,

v.

Daniel D. WILLEY, Defendant.

Bankruptcy No. 95–14744–BKC–AJC.

Adv. No. 96–0031–BKC–AJC–A.

United States Bankruptcy Court,
S.D. Florida.

July 22, 1996.

James B. Miller, Law Office of D. Jean Ryan, P.A., Miami, FL, for defendant.

Holly Davidson–Schuttler, Dubosar & Davidson, P.A., Boca Raton, FL, for plaintiffs.

### FINDINGS OF FACTS AND CONCLUSIONS OF LAW

A. JAY CRISTOL, Chief Judge.

**THIS MATTER** came on before the Court on June 19, 1996, for trial of the Plaintiff's Amended Complaint,[1] seeking the determination of the dischargeability of certain marital obligations pursuant to 11 U.S.C. § 523(a)(15). These obligations arise out of a divorce decree between the Debtor, Daniel D. Willey, and his former wife, Cindy Willey ["Ex-spouse"], and the Court, having conducted a lengthy trial on the merits, consid-

---

1. The Complaint was amended to add two new counts pursuant to 11 U.S.C. § 523(a)(5) and § 523(a)(2)(A), Counts II & III respectively. However, the parties have stipulated in the Pretrial Order that the award was not alimony or child support or in the nature thereof, and that Counts II (§ 523(a)(5)) and III (§ 523(a)(2)(A)) are denied. Therefore, the Court need only focus its attention upon Count I of the Amended Complaint seeking relief under § 523(a)(15).

ered the arguments of counsel, considered the evidence presented, observed the candor and demeanor of the witnesses, requested submission of proposed findings of fact and conclusions of law and proposed final judgments from each of the parties and considered same, and being otherwise duly advised in the premises, enters the following findings of facts and conclusions of law pursuant to Fed.R.Civ.P. 52(a), as adopted by Fed.R.Bankr.P. 7052:

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), and this Court has exclusive jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and 28 U.S.C. §§ 157(a) & (b)(1). *See In re Hesson*, 190 B.R. 229, 236 (Bankr.D.Md.1995). Further, this matter is a case of first impression for the Court.

### BACKGROUND OF THE CASE

The Debtor and Ex-spouse were married in 1984 and divorced in 1993. The Final Judgment of Dissolution of Marriage ["Final Decree"] (dated October 5, 1993) and the subsequent Order Partially Granting Former Wife's Motion for Rehearing and Order Amending Final Judgment (dated October 21, 1993), directed that the Debtor was to be responsible for, hold harmless and indemnify his ex-spouse from, debts and obligations arising out of their marriage, to wit: an outstanding lien and mortgage to Sun Bank on the former marital residence, (including all principal, interest, court costs and fees arising out of the sale or foreclosure of the property); the outstanding property taxes and income taxes for the year 1992; and any credit card obligations jointly or individually held prior to September, 1992 (other than one which the ex-spouse was solely responsible for), in a sum of approximately $18,000.00.[2] The family court awarded the Ex-spouse exclusive use, ownership and possession of the former marital residence, and a 1991 Mazda 626 (paid for by cash advances from the Debtor's credit cards).[3]

Subsequently, on or about October 3, 1995, two years after entry of the Final Decree, the Debtor filed his voluntary Chapter 7 bankruptcy petition.

The Ex-spouse timely filed this adversary action seeking a determination of the dischargeability of certain marital obligations pursuant to 11 U.S.C. § 523(a)(15).

At trial, the Ex-spouse submitted four individual credit reports relating to her personal credit history regarding four separate time periods; each of which, the Court finds reflected, in the end, that there were only two cards which the Debtor was obligated to indemnify the Ex-spouse for, to wit: a Discover Card, and a Choice Visa.[4]

The Ex-spouse also testified that she was owed $65,037.77 from the Debtor as a result of a foreclosure action on the former marital residence, and post-judgment interest thereon in the sum of $15,895.87. However, the Court finds that the evidence finally adduced

---

**2.** The Final Decree also provided that the Debtor was to hold harmless and indemnify the Ex-spouse for the sum of $13,500 as a marital debt owed to the Ex-spouse's mother. However, pursuant to the Pre–Trial Order on this matter, the parties have stipulated that the aforesaid debt was dischargeable and therefore discharged.

**3.** Although the ex-spouse testified that she had given the Mazda 626 to her former divorce counsel as partial payment of his fees, the evidence reflected that she had actually traded in the Mazda on a brand new Honda Civic just three weeks after the Final Decree had been entered, and further obligated herself to monthly payments of $262.00 for five years.

**4.** The Court further notes that the ex-spouse argued that the Debtor was to indemnify her for a NationsBank card which she, admittedly, forged the Debtor's name to and did not reveal to him until after she had charged on it. The ex-spouse

asserted that the sole card which the family court was directing her to be responsible for was a certain GM credit card. However, again, after repeated impeachment, the ex-spouse admitted that the NationsBank card was the sole card she had revealed to the family court at the trial regarding her divorce as being in her individual name, there was no evidence in her credit reports reflecting a GM card, and the ex-spouse did not produce evidence of a GM card even after this Court granted ex-spouse's counsel a brief recess so the ex-spouse could search her purse (as she had requested) for the alleged GM card which she swore was there. The ex-spouse retook the stand and swore that an "inquiry" made by GMAC, not GM, on her credit report reflected the existence of the GM card. However, this Court finds such an assertion to be incredible and unbelievable.

at trial revealed that there was never a fore-closure sale on the property. Rather the Ex-spouse sold the former marital residence, paid the lien to Sun Bank in full, paid her mother $27,396.15,[5] and paid all of the property taxes and all other obligations attributed to the former marital residence.

Further, the Court finds that there was absolutely no evidence presented that would reflect any debts as being owed to the IRS for the tax year ending 1992.

The Ex-spouse testified that her total present monthly obligations amounted to $3,639.00[6] and her monthly take-home pay amounted to only $1,103.32.[7] She also testified that she earned a total of $2,900.00 for all of the year 1995.[8]

The Court finds that the Ex-spouse: has no assets which a creditor could seek to satisfy any of these debts; receives monthly child support from the Debtor for her daughter; is employed on a full-time basis and earns a modest wage; has her own apartment in Chicago, Illinois; has her own car; dines out occasionally; has strong family support to assist her financially in the Chica-go area; receives cash through the mail from her parents whenever she wants it; has the ability to support herself; and, when the Ex-spouse's testimony is viewed cumulatively, it is fraught with untruths and inconsistencies.

The Debtor's testimony was credible, and the Court finds that: he now earns $40,800 a year as a contract administrator with Dade County Public Schools; pursuant to his contract with the school system, he is to remain "on-call" 24 hours per day, seven days a week; his bi-weekly take-home pay is $1,248.00;[9] and, his monthly take-home pay is $2,704.00 (after deductions for insurance and taxes), when computed on a 52–week year.

Further, the Court finds that the Debtor's monthly obligations amount to approximately $3,110.25 per month. The Debtor's monthly expenses include: child support, $803.25; rent, $995.00 per month; daughter's health insurance, $62.00 per month;[10] auto insurance, $115.00 per month; auto repairs, $25.00 per month; auto gas, $60.00 per month; auto loan, $275.00 per month; Sears Card reaffir-

---

5. The Court further finds that the family court, at the time of entering the Final Decree, found that there were only two liens on the former marital residence, one to Sun Bank for the mortgage and one to the ex-spouse's divorce counsel. The Final Decree also reflected that the ex-spouse's mother was only owed the sum total of $13,500 as a former marital obligation—with no lien on the real property. However, just a few short months later, the settlement statement from the closing on the sale of the former marital residence reflected that there was no longer a lien held by the divorce counsel (therefore nothing was paid to him); and, that the ex-spouse's mother received twice what she was entitled to receive without an objection by the ex-spouse as to the payment of these monies to her mother.

6. The Ex-spouse testified to her monthly expenses as follows: rent—$725; electricity—$40; beeper—$7; cable—$25; telephone—$90; fuel oil or natural gas—$107; misc. expenses—$25; groceries—$300; meals/entertainment—$100; gasoline and oil for car—$45.00; auto repairs—$20; car payment—$262; auto insurance—$55; train to work—$95; bus—$30; parking—$60; summer camp for daughter—$400; school/day care for daughter—$335; school supplies—$10; allowance—$20; clothing—$50; prescriptions, medical & dental for daughter—$20; vitamins—$10; beauty parlor for daughter—$15; ballet/tap for daughter—$28; entertainment, misc. school expenses for daughter—$10; subscriptions for daughter—$10; health insurance for daughter—$165; dry cleaning and laundry—$40; clothing for herself—$30; medical, dental, prescription for herself—$25; beauty parlor for herself—$20; veterinarian and grooming supplies—$25; vacations—$25; Hinsdale Hospital—$5; birthdays/holidays—$25; Shirley Boudreaux (mother)—$100; Nations Bank credit card—$20; GM card—$20; Prudential Life Ins.—$20; Beverly Morse (sister)—$25; Barnett Bank—$100; and Keith Parks—$100.

7. However, she still seemed to be able to magically maintain herself and her daughter off of this income and pay her other monthly bills.

8. However, the Ex–Spouse also testified that her rent alone amounted to $4,200.00 for 1995.

9. The Debtor, although he is supposed to take "single-0" or "single-1" on his W-4, takes four deductions so he can afford to pay his monthly obligations, and then "pays the tax piper" at the end of the year.

10. Although the Debtor pays the monthly health insurance for their daughter, the ex-spouse has decided to pay for additional coverage herself because she is unsatisfied with the level of insurance which the Debtor could afford to buy for his daughter.

mation debt, $50.00 per month;[11] electricity, $105.00 per month; telephone, $90.00 per month; food, $200.00 per month; clothing, entertainment, household supplies, $125.00 per month; and mother's loan for attorney fees, $205.00 per month.

Further, the Debtor owes approximately $4,000 as arrearage on his child support obligations; and, testified that due to the number of deductions he takes on his W-4, he will most likely be obligated to pay the IRS $2,600 to $3,000 at the end of the year.[12]

Although the Debtor's girlfriend was not timely subpoenaed by Ex-spouse's counsel, she voluntarily appeared at the trial and testified to the fact that: she had been recently laid off; presently resides with the Debtor; and, at present, is unsure as to whether she and the Debtor will ever marry. The Court also finds the girlfriend's testimony to be credible.

### ANALYSIS

"Section 523(a)(15) was enacted as part of Public Law No. 103–394 and signed into law by the President on October 2, 1994." *See In re Owens,* 191 B.R. 669, 673 (Bankr. E.D.Ky.1996). Section 523(a)(15) was enacted to prevent the discharge of property settlements arising out of divorce proceedings by "the Chapter 7 filing of a **'high-income'** spouse dissatisfied with the prospect of paying a substantial property settlement to [an ex-]spouse." *Hesson,* 190 B.R. at 236 (emphasis and internal quotes added).

Section 523(a)(15) provides that:

(a) A discharge under Section 727, 1228(a), or 1328(b) of this Title does not discharge an individual debtor from any debt—

(15) not of the kind described in paragraph (5) that is incurred by the debtor

in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or Territorial law by a governmental unit unless—

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; *or*

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

11 U.S.C. § 523(a)(15)(A) & (B) (emphasis added).

■ The case law under this newly enacted statute clearly establishes that the Debtor need only prevail under either 523(a)(15)(A) *or* (B), not both. *See, e.g., In re Huddelston,* 194 B.R. 681, 689 (Bankr.N.D.Ga.1996).[13]

The legal issues raised by this adversary proceeding and to be considered by this Court, are as follows:

a. With whom does the burden of proof lie regarding a § 523(a)(15) action?

b. What point in time does the Court use under § 523(a)(15) for purposes of balancing the equities of a discharge versus a non-discharge?

c. What method does the Court use to measure the Debtor's ability to pay?

---

11. The Debtor is seeking to reaffirm the debt to Sears as Sears has a purchase-money security interest in the furnishings of the home—one of which is his daughter's bed for when she visits.

12. Furthermore, these expenses do not reflect the costs of the Debtor's flights to Chicago to pick up his daughter and bring her to Florida for visitation. The Debtor has been unable to see his daughter for the past year because he does not have the money to buy two round-trip tickets for his daughter and himself every time she is to see

him. This expense is required because the ex-spouse, as she testified to, has refused to allow the daughter to fly under the airplane industries' "custodial" plan—where the carrier is responsible for the child during the flight.

13. *See also In re Florio,* 187 B.R. 654, 657 (Bankr.W.D.Mo.1995); *In re Scott, III,* 194 B.R. 375, 380 (Bankr.D.S.C.1995); *In re Silvers,* 187 B.R. 648, 650 (Bankr.W.D.Mo.1995); *In re Taylor,* 191 B.R. 760, 764 (Bankr.N.D.Ill.1995).

d. May the Court impute the income of the Debtor's girlfriend to the Debtor for purposes of determining whether the Debtor can afford to pay the marital obligations to the Plaintiff?

e. Whether the Debtor has the ability to pay the marital obligations set forth in the Final Decree from income or property of the Debtor not reasonably necessary to be expended for the maintenance or support of the Debtor or a dependent of the Debtor; or, if discharging such marital debt would result in a benefit to the Debtor which outweighs the detrimental consequences to a spouse, former spouse, or children of the Debtor?

a. ***With whom does the burden of proof lie regarding a § 523(a)(15) action?***

■ It is axiomatic that the primary purpose of bankruptcy law is to relieve the debtor from the burden of indebtedness. *Perez v. Campbell,* 402 U.S. 637, 648, 91 S.Ct. 1704, 1710–11, 29 L.Ed.2d 233 (1971); *In re Price,* 48 B.R. 211, 213 (Bankr.S.D.Fla.1985); *Matter of Holwerda,* 29 B.R. 486, 489 (Bankr. M.D.Fla.1983). Therefore, exceptions to discharge are to be interpreted narrowly and construed strictly against the objecting creditor. *See Brown v. Felsen,* 442 U.S. 127, 128, 99 S.Ct. 2205, 2207–08, 60 L.Ed.2d 767 (1979); *In re Hunter,* 780 F.2d 1577, 1579 (11th Cir.1986); *In re Delgado,* 151 B.R. 618, 621 (Bankr.S.D.Fla.1993).[14] The standard of proof for a § 523 action is the preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Normally, each and every element of nondischargeability in a § 523 action must be proven by the creditor. *Hunter,* 780 F.2d at

1579; *In re Rental Journal, Inc.,* 111 B.R. 1012, 1015 (Bankr.S.D.Fla.1989).

■ However, since the enactment of § 523(a)(15), the courts have broken into several camps regarding the burden of proof. One theory is that the burden of proof lies with the Debtor once the Creditor has established that the sued-upon debt arose out of a divorce proceeding. *See, e.g., In re Gantz,* 192 B.R. 932, 936 (Bankr.N.D.Ill.1996); *In re Hill,* 184 B.R. 750, 753–54 (Bankr.N.D.Ill. 1995); *Owens,* 191 B.R. at 672–73; *In re Slover,* 191 B.R. 886, 891–92 (Bankr.E.D.Okl. 1996).

Another theory regarding the burden of proof has been that the burden remains with the objecting creditor throughout, but the burden of going forward lies with the debtor once the creditor has established that the debt arose out of a divorce proceeding. *See, e.g., In re Phillips,* 187 B.R. 363, 368 (Bankr. M.D.Fla.1995); *Taylor,* 191 B.R. at 764–65; *Florio,* 187 B.R. at 657; *Silvers,* 187 B.R. at 649.

Yet another theory is set out in the *Hesson* case, where the burden, under 523(a)(15)(A), is upon the debtor after the creditor has successfully established that the debt arose out of the divorce; and, the burden is upon the creditor under § 523(a)(15)(B). *See Hesson,* 190 B.R. at 238.

Finally, there is a theory which places the burden upon the objecting creditor throughout the proceeding. *See, e.g., In re Butler,* 186 B.R. 371, 373–75 (Bankr.D.Vt.1995);[15] *Sateren,* 183 B.R. at 580; *In re Woodworth,* 187 B.R. 174, 177 (Bankr.N.D.Ohio 1995); *In re Dressler,* 194 B.R. 290, 303–04 (Bankr. D.R.I.1996).[16]

---

**14.** *See also In re Gantz,* 192 B.R. 932, 936 (Bankr.N.D.Ill.1996); *In re Sateren,* 183 B.R. 576, 580 (Bankr.D.N.D.1995); *Meyer v. Rigdon,* 36 F.3d 1375, 1385 (7th Cir.1994); *In re Finaly,* 190 B.R. 312, 315 (Bankr.S.D.Ohio 1995).

**15.** The *Butler* court set forth the reason for placing the burden upon the creditor throughout a § 523(a)(15) proceeding when it stated that

[I]n discussing § 523(a)(2)(A) [actions], the Supreme Court [ (in *Grogan,* at 286–88, 111 S.Ct. at 659–60)] explained that Congress' silence also meant that no subsection of [§] 523 was

intended to be any different from another subsection of [§] 523. In fact, throughout the [*Grogan* ] opinion, the Supreme Court unquestionably referred to the § 523 burden as a creditor burden.

*Butler,* 186 B.R. at 373, *citing Grogan,* 498 U.S. at 287, 111 S.Ct. at 659–60.

**16.** "Plaintiff bears the burden of proof and production on all elements, as the plaintiff has every motivation (and ability) to demonstrate that the debtor has the ability to pay the obligation[;] [a]nd the plaintiff has the motivation (and ability) to prove that the detrimental consequences of

Some Courts have relied upon § 523(a)(8) case law in placing the burden upon the Debtor. However, the *Butler* court pointed out that there are several reasons why the burden must remain on the objecting creditor unlike in an (a)(8) action: 1) § 523(a)(15) (like (a)(2), (a)(4), and (a)(6)), unlike (a)(8), is included in § 523(c), placing the burden on the creditor to timely file an objection to dischargeability, otherwise the debt is forever discharged; 2) in a § 523(a)(8) action, the debtor has the duty of filing the adversary, and he seeks the determination of dischargeability, whereas in a § 523(a)(15) action, it is the creditor who is seeking the determination of dischargeability;[17] and, 3) §§ 523(a)(8) and (a)(15) are worded differently—the language in (a)(8) calling for proof of the detrimental effects caused by nondischargeability, and the language in (a)(15) calling for proof of the benefits to the debtor and the harm to the creditor.[18] *See Butler* 186 B.R. at 374.

In a case like this, the Court finds that the *Butler* approach is most applicable, especially where, as here, the objecting spouse violated this Court's Orders regarding discovery, and inserted her own counsel as counsel for witnesses (her parents) in an effort to prevent discovering her true financial condition which would assist this Court in determining what, if any, detriment would accrue to said Ex-spouse by discharging these debts. Therefore, this Court finds that the burden of proof in this proceeding is on the objecting spouse.

discharge outweigh the benefits the debtor would otherwise gain." *Id. See also In re Carter,* 189 B.R. 521, 522 (Bankr.M.D.Fla.1995) (wherein court places burden upon objecting creditor regarding § 523(a)(15)(B)).

17. "Congress has therefore recognized the different contexts in which these two types of proceedings commence—(a)(15) by creditor impetus[,] and (a)(8) by the debtor." *Butler,* 186 B.R. at 375.

18. "The creditor is in the best logical position to plead the detrimental effects of a discharge, the converse would be bizarre—the debtor would have to prove how wonderful a discharge would be to him and comparably how mediocre a discharge would be to his ex-spouse. Proving the benefit to the debtor of a discharge would be an

### b. What point in time does the Court use under § 523(a)(15) for purposes of balancing the equities of a discharge versus a non-discharge?

As § 523(a)(15) is a new and recent addition to the Bankruptcy Code, the case law on the issue of what point in time is to be used by the Court in determining the equities of dischargeability versus non-dischargeability is also split.

Some courts have determined that the appropriate time for the court to consider the condition of the debtor and creditor is at the time of filing the petition in bankruptcy, *(see, e.g., In re Carroll,* 187 B.R. 197, 200 (Bankr. S.D.Ohio 1995); *In re Becker,* 185 B.R. 567, 570 (Bankr.W.D.Mo.1995); *In re Anthony,* 190 B.R. 433, 438 (Bankr.N.D.Ala.1995)), and other courts have held that it is the financial condition of the parties at the time of trial, *(see, e.g., Dressler,* 194 B.R. at 290; *Gantz,* 192 B.R. at 937; *In re Morris,* 193 B.R. 949, 952 (Bankr.S.D.Cal.1996); *Owens,* 191 B.R. at 674–75; *Hesson,* 190 B.R. at 238); while, still other courts have looked at a broader spectrum, the time period running through the time of trial and into the immediate future, *(see, e.g., Taylor,* 191 B.R. at 767; *In re Paneras,* 195 B.R. 395, 404–05 (Bankr. N.D.Ill.1996)).

The Debtor argues that the appropriate time frame for the Court to consider is at the time of filing the petition, because looking into the future is too unpredictable and § 523(a)(15) is an "all or nothing" determination of dischargeability.[19] Whereas, the Ex-

illusory burden. Practically, what the section calls for is a creditor showing that the debtor can pay for his or her obligations despite the petition or plan. The reverse situation would present no actual burden." *Butler* at 374.

19. *See, e.g., Taylor,* 191 B.R. at 767 (statute leaves no provisions for determining that a part of a debt may be found dischargeable, but the remainder non-dischargeable); *Silvers,* 187 B.R. at 649; *Phillips,* 187 B.R. at 368; *Hill,* 184 B.R. at n. 15 (stating that language of § 523(a)(15) appears to indicate an intent of congress to limit the courts to an "all or nothing" approach). *Contra In re Comisky,* 183 B.R. 883, 884 (Bankr. N.D.Cal.1995); *In re McGinnis,* 194 B.R. 917, 921 (Bankr.N.D.Ala.1996) (may discharge part and not discharge other part of debt, only if debtor has sufficient disposable income to pay all

Spouse argues that the appropriate time frame for the Court to consider is at the time of the trial.

Because the evidence presented at trial related to the condition of the Debtor and Ex–Spouse at the time of trial, the Court will apply the time of trial standard; this is not to say that a different standard would not apply in another case.

### c. *What method does the Court use to measure the Debtor's ability to pay?*

■ Most courts interpreting the "ability to pay" language of § 523(a)(15)(A), apply a "disposable income"/"ability to pay" test; where the court is to analyze whether the debtor's budgeted expenses are "reasonably necessary".[20] *See, e.g., Taylor,* 191 B.R. at 765; *Hill,* 184 B.R. at 755; *Phillips,* 187 B.R. at 368–69; *Hesson,* 190 B.R. at 237–38. The *Hill* court stated in dicta, that

> "Courts interpreting 'reasonably necessary' have arrived at several standards. Many courts are reluctant to impose their own values on the debtor and exclude only luxury items and obvious indulgences. *In re Navarro,* 83 B.R. 348, 355 (Bankr. E.D.Pa.1988). Other courts find that only those expenses for basic needs not related to the debtor's former status in society or accustomed lifestyle should be allowed. *In re Reyes,* 106 B.R. 155, 157 (Bankr.N.D.Ill. 1989).

*Hill,* 184 B.R. at 755.

This Court will follow the *Navarro* standard and will not impose a value judgment on what one deems to be reasonable or necessary unless clearly an overindulgence or luxury; and, the Court finds that, under these facts, the Debtor has no over indulgences or luxuries for which he is obligated as set forth in his budget, and his expenses are reasonable and necessary.

Regarding § 523(a)(15)(B), the courts have adopted a "totality of the circumstances" test, which looks at, primarily: the income and expenses of each party; the nature of the debt in question; and, the former spouses ability to pay same or the inability of creditors to collect from the former spouse.[21] *See, e.g., Huddelston,* 194 B.R. at 689, *citing Hill,* 184 B.R. at 755; *Carroll,* 187 B.R. at 201; and *Florio,* 187 B.R. at 658.[22]

### d. *May the Court impute the income of the Debtor's girlfriend to the Debtor for purposes of determining whether the debtor can afford to pay the marital obligations to the Plaintiff?*

Plaintiff argues that the Court should impute the income of the Debtor's girlfriend to him for purposes of determining the "disposable income" of the Debtor.

However, the Courts have split on whether they should impute a debtor's new spouse's income to the debtor under § 523(a)(15)(A) & (B) for purposes of the "disposable income" and "totality of circumstances" tests. *Compare Carter,* 189 B.R. 521 (rejecting imputing income of new spouse, as "the language of [§] 523(a)(15)(A) restricts the determination of the ability to pay solely to the income of the debtor[;] it is not enhanced by inquiring into the financial circumstances of the debtor's current spouse"); *with Gantz,* 192 B.R. at 936–37 (rejecting imputing of current spouse's income for (a)(15)(A), but imputing income for (a)(15)(B)); *and, with In re Cela-*

---

or a material part of the property settlement within a reasonable amount of time).

**20.** The disposable income test has been adopted from Chapter 13 proceedings, specifically, 11 U.S.C. § 1325(b)(2). *See Huddelston,* 194 B.R. at 687–689. 11 U.S.C. § 1325(b)(2) defines disposable income as "income which is received by the debtor and which is not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor; and, if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation and operation of such business."

**21.** The legislative history of § 523(a)(15)(B) establishes that "if discharging the debtor would inflict little or no detriment on the non-debtor spouse, the debt must be discharged." *Paneras, supra* at 404, *citing* 140 Cong.Rec.H. 10752–1 (daily ed. Oct. 4, 1994). This is especially true where, as here, the non-spouse has no assets by which the creditors of these obligations could seek to co''·ct against. *See Huddelston,* 194 B.R. at 689, *citing* H.R.Rep. No. 835, 103d Cong., 2d Sess. 54 (1994), *reprinted in* U.S.C.C.A.N. 3340, 3363.

**22.** *See also Dressler,* 194 B.R. at 305; *Hesson,* 190 B.R. at 240.

*ni,* 194 B.R. 719 (Bankr.D.Conn.1996) (court should consider income of current spouse of both parties in determining in weighing equities under § 523(a)(15)(B)).

This Court finds that there is no present income to impute to the Debtor, as his girlfriend is not employed at present.

■ Further, no case law has ever imputed or considered the income of a debtor's girlfriend, and this Court will not consider same, as it could lead to a chilling effect on the courtship and re-marriage of divorced partners.

**e.** ***Whether the Debtor has the ability to pay the marital obligations set forth in the Final Decree from income or property of the Debtor not reasonably necessary to be expended for the maintenance or support of the Debtor or a dependent of the Debtor; or, if discharging such marital debt would result in a benefit to the Debtor which outweighs the detrimental consequences to a spouse, former spouse, or children of the Debtor?***

■ The Court adopts the holding of the *Slover* cases, as to this issue, and finds that "[T]he debt will remain dischargeable and therefore discharged if paying the debt would reduce the debtor's income below that necessary for the support of the debtor and the debtor's dependents." *Slover,* 191 B.R. at 891.[23]

■ As stated *supra,* this Debtor's reasonable necessary monthly expenses exceed his monthly income by $305.75.[24] The Court finds that, under § 523(a)(15)(A), (i.e., the "disposable income" test,) this Debtor does not have the ability to pay and the debts are dischargeable and therefore discharged.

■ If the Debtor prevails under § 523(a)(15)(A), where the debtor has no ability to pay the debt, the inquiry must end

and the debt must be discharged. *See Silvers,* 187 B.R. at 650; *Gantz,* 192 B.R. at 936; *Huddelston,* 194 B.R. at 689; *Owens,* 191 B.R. at 674; *Hesson,* 190 B.R. at 237 (if the debtor has no "disposable income" to fund payment of the obligation, the debtor prevails and the exercise is over). However, because this case is one of first impression, the Court will address whether the debts are dischargeable and therefore discharged pursuant to § 523(a)(15)(B), (*see Woodworth,* 187 B.R. at 177).

■ Even if the Debtor had disposable income, the benefits of the Debtor's discharge should only be sacrificed if there would be a substantial detriment to the former spouse versus the Debtor's need for a fresh start. *See* 140 Cong.Rec. H10752, H10770 (daily ed. Oct. 4, 1994) (statement of Chairman Brooks). Therefore, even if the Debtor does not prevail under § 523(a)(15)(A), the Court must then inquire into § 523(a)(15)(B) and determine whether the resulting benefit to the Debtor outweighs the detriment to the former spouse, (*Florio,* 187 B.R. at 657; *Phillips,* 187 B.R. at 368); and, must be concerned that forcing the Debtor to pay the equalizing debt, may nickel and dime the Debtor and jeopardize any personal relationships he may have, (*see Morris,* 193 B.R. at 954).

Therefore, 'if a non-debtor spouse would suffer little detriment from the debtor's non-payment of an obligation required to be paid under a hold harmless agreement (perhaps because it could not be collected from the non-debtor spouse or because the non-debtor spouse could easily pay it) the obligation would be discharged', even though the debtor himself might have the ability to pay the obligation.

*Huddelston,* 194 B.R. at 689 (internal quotes and parentheses in original), *citing* H.R.Rep.

---

**23.** "Section 523(a)(15)(A) does not permit consideration of factors which show that discharging the debts to debtor would cause creditor to expend [her] own funds reasonably necessary for her maintenance." *Woodworth,* 187 B.R. at 177.

**24.** This may be a reason as to why the Debtor lives with his girlfriend, because, when she was working, she could help pay for some of this monthly debt. However, as the evidence revealed, she is no longer working and the monthly obligations for which the Debtor is solely liable exceed his income by over $300.

No. 835, 103d Cong., 2d Sess. 54 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3363.[25]

■ Hence, where, as here, the non-debtor spouse has no assets which a creditor could look to for payment, the Court finds that the benefits of a discharge to this Debtor outweigh the detriment to the Ex–Spouse pursuant to § 523(a)(15)(B), (*see Huddelston,* 194 B.R. at 689; *Woodworth,* 187 B.R. at 177–78).

The benefits to the Debtor in this case are: the policy favoring discharge and narrowly construing and applying discharge exceptions is further served by finding in the Debtor's favor, (*see Taylor,* 191 B.R. at 767); discharging these debts allows the Debtor to begin his fresh start, unburdened by debts which he has no ability to pay, (*see Hill,* 184 B.R. at 756); the Debtor receives relief from his financial plight as he attempts to start a new life and perhaps a new family, (*see id.*); this Ex–Spouse will not be chasing the Debtor back through the state courts trying to collect on these monies for the rest of his life; and, the Debtor can try to visit his minor daughter again by saving some money for a ticket to Chicago, (*see Huddelston,* 194 B.R. at 689 (court should consider intangible effect its findings will have on the parties)).

These benefits outweigh any detriment to the Ex–Spouse, because: part of the debt she is suing to recover was paid upon the sale of the former marital residence, (*see, Paneras, supra* at 404–05); she has pled poverty during these proceedings and has no assets which a creditor could seek to satisfy the debts, (*see Owens,* 191 B.R. at 675; *Woodworth,* 187 B.R. at 177–78; *Huddelston,* 194 B.R. at 689); she is apparently doing quite well supporting herself, attending college,[26] and paying her monthly payments on the new car, (*see Phillips,* 187 B.R. at 369);[27] both Ex–Spouse and Debtor live frugal lifestyles and have limited budgets, (*see Hill* 184 B.R. at 756); the debts in question reflect that they are old and therefore unlikely that this Ex–Spouse will be pursued by the creditors of the marital obligations; there was no evidence put on by the Ex–Spouse reflecting that any of the creditors of the marital debts were seeking to collect from her; discharge of the debts will have little effect on this Ex–Spouse, (*see Taylor* 191 B.R. at 766), as she could not pay her debts and meet her monthly obligations anyway, (*see Morris,* 193 B.R. at 954); the daughter is provided for through the Debtor's child support payments; Ex–Spouse is employed on a full-time basis by her brother-in-law making a fair wage, (*see Phillips,* 187 B.R. at 369); Ex–Spouse has her own apartment, (*see id.*); Ex–Spouse owns a new car and is making the monthly payments for same, (*see id.*); and, Ex–Spouse appears to be magically capable of making ends meet every month on her income.

Quite simply, the ex-spouse should have seriously contemplated the filing of her own bankruptcy.[28] Even if the Court found that the Debtor should pay these debts, the former spouse is hopelessly under water every month on her own monthly obligations. (*see Hill,* 184 B.R. at 756; *Morris,* 193 B.R. at 954 (where non-debtor spouse is hopelessly in debt, the best solution is for both spouses to file bankruptcy), *citing Woodworth,* 187 B.R. at 176–78). Even if the Court required the Debtor to make minimal payments, it

---

**25.** *See also Woodworth,* 187 B.R. at 177–78 (since debt cannot be collected, as non-debtor spouse has no assets for creditors to seize, there is no detriment which outweighs the benefit of discharge to the debtor); *Hill,* 184 B.R. at 756 (citing same as *Huddelston*); *Paneras, supra* at 404–05 (economic benefit to debtor outweighed detriment to non-debtor spouse because underlying obligations were satisfied and paid out of the closing proceeds from the sale of the former residence).

**26.** As a further note, the state court in the Final Decree found that the Debtor was not to be responsible for putting the Ex-spouse through college.

**27.** Court discharged marital debts although detriment to former spouse meant that she could not afford to go to college, she would have to sell the marital residence, incur a substantial tax burden, and be forced to actually work 12-hour days on a commission basis. *See Phillips,* 187 B.R. at 369.

**28.** The Debtor testified to the fact that he has had several telephone conversations with the Ex-spouse during these proceedings wherein she has advised him that she is contemplating the filing of her own personal bankruptcy.

would be of little impact on the ex-spouse's overall financial condition and she still could not repay her debts anyway, (see *Woodworth*, 187 B.R. at 176–78). The Court finds that this Debtor should not be burdened with debt where payment still leaves the ex-spouse with negative excess disposable income and hopelessly in debt. *See Morris*, 193 B.R. at 954.

Finally, this Court finds the inquiries made by the court in *Hill*, particularly applicable here when it stated:

> [I]f the court had ordered the debt between the Plaintiff and the debtor at issue here nondischargeable under § 523(a)(15), and the Plaintiff then files a Chapter 7, discharging her liability for the third party debts, would the debtor still be legally obligated to pay the nondischargeable 523(a)(15) debt?

> [Also,] if the Plaintiff now files for bankruptcy, can the Debtor raise § 523(a)(15) in that case? Or is it *res judicata*?

*Hill*, 184 B.R. at n. 16.

It appears to the Court that in this case, exactly this scenario could occur: the Debtor ends up with a nondischargeable obligation due to the potential liability that may accrue to his former spouse, and then the former spouse files bankruptcy discharging her potential liability while committing her former husband to repayment of these obligations.

Based on the totality of the evidence, and the applicable law, the Court finds that the marital debts and obligations at issue herein are dischargeable and therefore discharged, and that the former spouse's action to except these debts from discharge, pursuant to 11 U.S.C. § 523(a)(15)(A) & (B), is denied.

A final judgment in conformity with these findings of fact and conclusions of law shall be entered simultaneously herewith.

**DATED AND SIGNED.**